Our first case today is 2015-2062 CSP Technologies v. Clariant Corporation. Is it Abramick? Abramick. Abramick. Mr. Abramick, please proceed. Thank you. May it please the Court. The patent at issue in this appeal relates to moisture-proof plastic vials, and there are two grounds at issue. The first is anticipation based on the Heckle reference, and the second is obviousness based on the Wheeler reference. Now, the question before the Court is the same with respect to both grounds, and that is whether each reference discloses the element of Claim 7 in the challenge patent. And that element is a flexible lip seal that is deflected when the vial is in the closed position. And so I'd like to first turn to the ground based on Heckle. Heckle incorporates another patent, the Abrams patent. I will refer to them both as the Heckle patent collectively. In Heckle, there is no express disclosure of a deflected lip seal. There's no description in Heckle of a lip seal that's deflected in the closed position, and there's no depiction of a vial where a lip seal member is deflected in the closed position. So what we're dealing with is an issue of inherency. And when we look at the Board's opinion on inherency with respect to Heckle, we see that the single critical piece of evidence that the Board relies on to support its conclusion is that the upper ridge of the vial in Heckle is greater than the gap in the cap that that ridge has to fit into. But we need to look a little bit closer at the dimensions that we're talking about. Because the numbers relied upon by the Board come from various portions of the Abrams patent that give numbers for various components of the vial. And when you do the math, you come up with an annular ridge that is almost 40% greater than the gap in the cap that it has to fit into. And that makes absolutely no common sense. If I were to ask you to shove a baseball into a shot glass, we know that one of two things is going to happen. The shot glass typically doesn't bend. I thought the whole point is that the piece coming down does bend, and precisely because what's going into it is too big to fit in without bending, it necessarily bends. Sure, and so when we're just talking about that piece that extends down from the cap, the patent does indicate that that may be a flexible material. But that upper ridge has to fit in with the gap. So that's what we're talking about when we're talking about the 40% figure makes absolutely no sense. But your expert testified that that lip is flexible. The expert testified that that lip probably is flexible, but that doesn't necessarily mean that that lip is necessarily deflected when you finally close that vial. And to illustrate this point, I think this is where the dimensions become an acute problem. But for it to deflect and bend, then it necessarily must be bigger than the gap itself. Not necessarily, Your Honor, because when that upper ridge is going in at an angle, and you can see how the vial closes, and there's an illustration at page 12 and 13 of the red brief, that there's an angle. And because of that angle, you're going to have some interference necessarily with the flexible lip seal number as you're closing. But ultimately, when that vial is closed, there is no deflection. At least in the reference, there is no disclosure of a deflected lip seal. And I think that this problem is highlighted acutely at a certain portion of the Abrams patent. And we can find this in Column 8, and that's in the appendix at page 705. And this describes the annular ridge, and it says, one, the annular ridge fits… Where in Column 8 are you reading from? Lines 35 through 40. Thank you. So it says, after the seal has been guided within the vial, the annular ridge fits within the gap. So that whole ridge has to fit into the gap. The next portion says it's adjacent the wall section. That means that the top of the ridge is up against the bottom of the cap. So not only does that ridge have to fit into that gap, it has to fit all the way in. There's no way that can happen if it's 40% bigger than the gap. I'm saying 40%, but it's 37%. It's 37%. You are correct, Your Honor. I mean, a 10% difference between what you're saying and what the actual percentage is seems like a statistically significant amount. You're correct, Your Honor. It is 37%. And I think in the briefing, the parties have said almost 40%, and I think the other side has acknowledged that. But I'll agree that it's 30% or 37%. The other important feature or portion of that patent, if you look at that same section that we were talking about, where it says the angled surface nests against the angled surface of the annular ridge, what that's talking about is there is an angled surface on the cap, and there is also an angled surface on the ridge. And those two portions nest together when the vial is closed. And again, there is no way that would happen. And this is illustrated, these features are illustrated at pages 12 and 13 of the red brief. What that passage means is that that gap in the cap is contoured to fit perfectly around that ridge. There is no way that you can reconcile that 37% difference with the disclosure in the patent. In fact, the only way that you can even begin to try to reconcile those numbers is to start playing with those numbers and say, well, what if we had a different size annular ridge? But once you start playing with those numbers, you have entered the world of inherency, possibilities or probabilities. There's just no disclosure. Isn't the key question here whether the lip seal would deflect and not whether it would work? Not necessarily just whether it would deflect. The argument on the point is it would deflect. Not necessarily just that it would deflect, but that it's deflected in the closed position. And so, with the dimensions given in the Abrams patent, there is no way that when you finally close that vial, that you're going to have a workable vial. And the claims call for a workable vial. Isn't what you just said, doesn't that mean that what is shown with those dimensions, shown, I include the words, not just figure five, not just the figures. That is the annular ridge, is that what we're talking about? The annular ridge is the top of the vial, the lip seal. The lip seal, given those measurements, cannot be anything but deflected when there is a closed position. I'm sorry, I didn't understand the first part of your question. You're saying the statements, how do you reconcile the two? Once you have the dimensions, that lip seal must be deflected in the closed position. Isn't that right? Because there's a 37% difference in the horizontal... The vial must be broken when it's in the closed position. That's the only reasonable conclusion. If you look at the figure that we have on page, I believe, 15, we demonstrate a... Why is that the only reasonable conclusion, assuming the lip seal is flexible enough? Because that upper ridge, we're talking about rigid plastic components. We're not talking about compressible foam. I think the key thing to realize is from that portion of Abrams that talks about that... Didn't the board conclude that, and then maybe kind of get the details wrong, your expert talked about polypropylene as the lip seal composition, and the Abrams says, well, you could also use polyethylene, and as I understand it, polypropylene is far more brittle than polyethylene, so why could the board not conclude that the polyethylene is flexible enough that this description teaches with those dimensions, if you're going to stuff the annular ridge in there, the lip seal's just going to be bent when the thing is closed. Because there's just no evidence, and it defies absolute logic for us to think that that big of a ridge is going to fit all the way to the top of that gap. It just defies all common sense. That's just attorney argument. There's no evidence. You have no evidence on that point. Your expert testified polypropylene, it was polyethylene. Your expert testified a straight down closure, it was an angled closure. Each of those things would increase the flexibility of the circumference, the diameter of the part that you're sticking the lid into. I mean, I don't understand. This is a substantial evidence review. It's like smoke and mirrors here today. You went from 37% to almost 40% in your brief, and today it was 40%. You dropped the word almost. Then you're telling us there's no difference today between polypropylene and polyethylene. There's no testimony in the record that there's no difference, and the board made fact findings on all of this. I feel like your argument is a lot of smoke and mirrors, and yet there is substantial evidence for the things that the board found that you just want us to ignore. We're not suggesting there's no difference between polyethylene and polypropylene. What we're talking about with that is the evidence that we put forth, the finite element analysis that our expert put forth, that if you had a vial with these proportions, they would break. If you had a vial with these proportions made out of a different material and you used a different style of closure than is articulated in the HECL PAC, then it would break. That's what your expert testified. And the board said that's not the right material, that's not the right closure, and today, for the first time in your briefs, you're arguing to us that it wouldn't have mattered. Your expert didn't say that. There's no evidence in the record of that. I think the main point, Your Honor, is that we never even should have gotten to the point where we needed to submit evidence that a vial with those proportions would work and close based on a common sense. And I think the problem was is that if there was some issue with that evidence, the party with the burden should have come forward and showed that a vial, the party with the burden on inherency to show that there necessarily would be deflection in the closed position, had every opportunity to come forward with evidence, with the controls that they say... The requirement that there be deflection in the closed position doesn't go to operability. It doesn't go to that the ridge has to fit tightly within the gap. Being wedged, the board found that being wedged in that gap was enough because you've already satisfied the limitation of a deflection in a closed position. Sure, and I think the issue here is that, yeah, the conclusion was, and this comes from the expert of Appalese, is that you're going to be wedged into that gap. But there is no way that you can wedge into that gap all the way to the top of that vial. It doesn't have to be wedged all the way. That's not what we're looking at. We're looking at whether the ridge deflects in the closed position. And when it's in the closed position, according to the vial in Abrams, it does go all the way to the top. Yeah, can I just ask you about that? Where's the specific reference in Abrams that says if this is the edge and this is the cap, that the top of the edge has to touch the underside of the cap? And that's column 8, lines 35 through 40, Your Honor, that we just went through. Okay. I would like to briefly turn to the ground based on Wheeler because I see I'm... You're in your rebuttal time. Okay. The single piece of evidence that was relied on by the board, there's no express disclosure in Wheeler of deflection. The container, figure 7, was the only piece of evidence. Figure 7 in Wheeler was the only piece of evidence relied on by the board to show an inherent disclosure of deflection. That vial in figure 7 does not have a container that's closed down, that's closed. The cap is sitting on top of the vial. Okay. And the way that appellees say there's deflection is they draw a line straight from the drawing up to the top of the vial. We demonstrated in our brief that that drawing is not to scale. If you overlay one side of the wall onto the other side of the wall in that drawing, they're not symmetrical. And they're off by a fraction of a millimeter. And if you look at the line that's drawn up to that ridge by appellees, that interference is a fraction of a millimeter. The margin of error in the drawing swallows up the entire rationale for the board in finding that there would be deflection. That figure is not reliable to show the relative positioning. Thank you, Your Honors. We'll save the rest of your time for about all. Mr. Sullivan. Please, the Court. I just want to address first, there's been a couple questions asked about where in Abrams the lip of the container has to meet the top, the very top when it wedges into the cabinet. The underside of the lid. Right. And we pointed to column 8. I think it was lines 35 through 40. Right. And I think what's being referenced there is actually wall section 85. Wall section 85. And there was also reference to the second section, the next sentence. There is, there is. So I think. Does the underside of the lid have a number in figure 5? Yeah, and that's what I was going to get at. 85 is actually the wall, it's the side of the cab. It's not the top of the cab. So if you look at 87 as the angled side of that wall and 85 as the straight part, that's what was being referred there as the wall section. So if I understand your point, and this is why I asked about it, it does seem fairly critical. If Abrams does not require that the top of the edge actually contact and remain in contact in a closed position with the underside of the lid, then it's suddenly a lot easier to imagine the thing closing as you lift a little space, but sealed up with the deflected lip seal. Exactly right. That is correct. So I think here there is substantial evidence supporting the board's finding. What do you do with the nest and fit language? Those two words seem at least pretty suggestive of something like what Mr. Sure. Well, the nesting is referring, again, to that angled surface, 87. It's not referring to anything with respect to the lip seal member, which is on the inside. It's referring to the angled surface, 87, on the outside, again, along with that wall, 85. That's on the side of the, we call it the skirt of the cab or the lid. So that's where the nesting comes from. The board, again, addressed that issue at length as well as the fits within issue. Again, the fits within issue, there was evidence in the record that you can have it wider. You can stuff it in there. You can stuff it in there, but it still fits within. That's a slightly, I mean, fit is not what I would expect the word to be used in a shoe store if they were saying, you know, give me a size 5 shoe or something. Well, it could be tight. That's true. But we want tightness here. That's what's going to help you form that seal. And you are going to overshoot on that lip of the top of the container to make sure that it does deflect. That cantilever, that very thin and long has a specific structure on that lip seal member, and it's there so that it does deflect and that it forms a seal. You need that tightness. If it was too loose, it wouldn't form a seal. So you're right. It is a tight fit, but it's still a fit nonetheless. So as long as there's deflection, then a seal is formed? Correct. Correct. You want that deflection. The patent actually says through the polyethylene material that's used for, you know, the more resilient, softer material that's used for that cap, the design of the lip seal member being long and thin and cantilevered, that is promoting and focusing on this deflection. You want that deflection. That's what that design is teaching there in the reference. So it's not just the dimensions. Dimensions are important. But it's also the material used. It's the design of the lip seal member. That's what's causing that seal. What do you say about the argument from the other side that there was some jumping back and forth here between anticipation by express disclosure and anticipation by inherency, and this is really neither one of them because there's no express reference to deflection and no real inherency set of findings was made? It's a good question. We never argued, so Clarence never argued inherency in front of the board. That wasn't our position. Our position was that this was an express teaching. You always, for anticipation, my understanding is that it's always taken and viewed as understood by one skilled in the art. When you construe claims, you take it as how one of our skilled in the art would understand those claims. It's the same thing when you look at a piece of prior art for purposes of anticipation. It's how one of ordinary skilled in the art would understand that reference. I think that's black letter law actually. So our position was that when you take into account the materials, the designs, the dimensions, everything that's taught by this reference, and the same applies for Wheeler as well here, everything that's taught by these references, this is how one of ordinary skilled would understand what this reference teaches, and it teaches a deflection in the closed position. I think CSB argued down below they tried to make some inherency arguments, and the board rejected that. They didn't find their inherency arguments were persuasive. They found our arguments were persuasive, that one of our skilled in the art would understand these references taught each of the limitations of the claims. So I don't think it's an inherency case. You don't interpret the prior art in a vacuum. You have to interpret that reference as what it teaches to one of ordinary skilled in the art. One of the other issues raised by appellant here is the shifting of the burden. I just wanted to address that briefly. I don't think there was any shifting of the burden here in this case by the board. The board reminded me twice during the hearing of the statutory duty that they had, and the clarient had the burden here as the petitioner in the IPR. They had the burden to prove by preponderance of the evidence that the prior art disclosed each and every limitation of the claims. They did that twice in their- Can that place any type of requirement on a patent owner to issue any type of argument or evidence in support of patentability? You know, this gets a little bit- I don't see that in the regulation. It's not. No, this gets into a little bit. You can make this issue complicated by looking at shifting the burden of production as opposed to burden of persuasion. But I think what happened here was we met that initial burden of production. We established a case of unpatentability of these claims. Let's say that happened. Why is there a requirement on the patent holder to step forward and meet that prima facie case? Well, I don't know if it's a statutory requirement, Your Honor, but certainly you want to look at what their arguments are. You need to consider what the other side's arguments are. You need to look at what the patent owner is saying. I'm sorry, say that again. Isn't the PTO the one that should be making those arguments or looking at the arguments that the petitioner put forward and deciding as to their validity or their strength? Yes, yes. The board does look at what evidence the petitioner supplies, but it also looks at the evidence from the patent holder. Why doesn't the board speak in terms of a prima facie case and then looking towards the patent holder to refute the evidence that you put forward? Well, I'm not sure I understand your question, Your Honor. Are you saying that the board shouldn't have looked at what evidence they provided? No, I'm asking you as to what you think. Yeah, what I think is that the board needs to look at both sides' evidence, and then they need to make a conclusion as to whether or not the petitioner satisfied the burden. Your position is that the patent holder does have an obligation to support patentability. I think that the board needs to look at both sides' evidence. They can't just ignore what the patent owner says. If the patent owner doesn't want to say anything, that's fine. Then there's nothing for the board to look at, but the board then still needs to decide if the evidence that the petitioner put forward satisfies the burden. And I think they did that here. But I think because the patent owner in this case did supply evidence, they need to look at that evidence. Okay. Yeah, certainly they don't want to ignore that evidence because that evidence could take our evidence outside of the preponderance. Do you want to address Wheeler? I think that's the only point you haven't hit upon. Wheeler differs from the Abrams reference in that—or Heckle and Abrams—in that it doesn't disclose any dimensions, and you can't calculate dimensions in Wheeler the way you were able to in Heckle-Abrams. So tell me how you get to the same point. Obviously, this is an obvious reference, not an anticipation reference, but tell me how you get to Wheeler's disclosure of deflection. Yeah. So Wheeler has, again, some textual language. So it wasn't just the drawings, but Figure 7 and Figure 8 are important. Wheeler has some textual language that states that, again, it's a resilient, flexible material for that cap, that it does have a sealing bead on its lip seal member. That's the rounded part at the end. Those beads are often used and are typically used for a deflection. They're there to promote. You've added some more material at the end of that lip seal member to promote that interference and that deflection. It's the 20 prime. 20 prime. Exactly. And when you take into account the text—here, let me grab that here—the text which is in the appendix, if we go to 926, and that's in the Wheeler 475 patent. If we look at Column 4, lines 27 through 31, there's a reference here which is describing what's being shown in Figure 7 and 8. And that is, again, the fluid tightness achieved by a downwardly extending integral internal flange 19 prime. That is the lip seal member. On the cap with the bead 20, that's that sealing bead on the end, on the outside of its housing. There's another reference to the cap being made of a preferably synthetic resin such as a polyethylene that's sufficiently resilient. That is in Column 3, lines 4 through 5. When you take that disclosure in combination with what's being shown in Figure 7, one of Orange's skill in the art would understand that how this product works, how it forms its seal with this resilient cap, is that the lip seal member, 19 prime, is going to have an interference fit. When it comes down and seals on top of the bottle, here, the container, 1 prime, on its neck, on the interior side of that, that is going to have an interference fit. Well, that interference fit is naturally going to cause the lip seal member to deflect inward. Again, that's how it forms its seal. And it does, again, disclose that it does have a moisture-tight seal here. So, again, we think both of these references disclose and teach what's in Claim 7. Claims 1 through 6 are not being challenged on appeal by the appellant. We think that portion is an automatic affirmance, in our mind, of the board's decision. But we think that the board's decision should be affirmed with respect to Claim 7 as well. Because the prior art, there's substantial evidence in the record that the prior art discloses that element, that the lip seal member be deflected in the closed position by a preponderance of the evidence. Okay, thank you, Mr. Sullivan. Thank you. Abramick, am I saying it right this time? Yes, thank you, Your Honor. I assume about all time. I'd just like to briefly address Your Honor's question about how we know that the top of that ridge goes to the bottom of the container. In Abrams. In Abrams, yes. And I think it goes back to that same portion that we were talking about. And the key thing, I think, to look at is that the portion where it says those angled pieces of the ridge and the cap have to nest together. There's no way those two pieces nest together if the top of the ridge is not at the bottom of the cap. There's no way. Very briefly, on the Wheeler ground, I think part of the decision here turns on the law on what you can take from patent drawings. And we cited several cases that stand for the proposition that patent drawings, unless otherwise noted, are not to scale and cannot be relied on to define precise proportions or particular sizes. Appellees rely on cases that say that you can look at patent drawings when you're trying to look at relative proportions between components. But those cases are easily distinguishable. And that is because none of those cases do we have the margin of error swallowing up the basis for that relative proportion. And in none of those cases are we dealing with this minute precision that we need in these types of vials with all these interlocking components fitting together. But this point that you're making really applies only to Wheeler. Wheeler, that's correct. Because the Abrams one was based on the dimensions in the written case. Correct. It's what can figures show, what can figures teach. And we just cannot rely on Figure 7 to inherently disclose deflection when that vial isn't even closed and when the margin of error shows that that intersection is not a reasonable basis for the court to have formed its opinion. Thank you, Your Honors. Okay. I thank both counsel for their argument.